**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC 0 5 2024

TAMMY H. DOWNS, CLERK
By: _____
DEP CLERK

### IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### DELTA DIVISION

NIKKI FOREMAN, Special Administrator                    **PLAINTIFFS**
Of the Estate of BONNIE GAIL HUTTON,
deceased; and CHARLES HUTTON

**V.**               **CASE NOS.**        **2:24-cv-00076-BSM**
                                          **2:24-cv-00100-BSM**

BLESSED ROAD, INC.;                                     **DEFENDANTS**
JENNIFER DYSART;
CH ROBINSON COMPANY, LLC;
CH ROBINSON COMPANY, INC.;
CH ROBINSON WORLDWIDE, INC.; and
TOTAL QUALITY LOGISTICS, LLC

### SEPARATE PLAINTIFF CHARLES HUTTON'S FIRST AMENDED COMPLAINT

COMES NOW, Charles Hutton, by and through his undersigned attorneys, who

bring this Amended Complaint against Defendants Blessed Road Inc., Jennifer Dysart,

CH Robinson Company, LLC, CH Company, Inc., CH Robinson Worldwide, Inc., and

Total Quality Logistics, LLC, allege and state:

### I. INTRODUCTION

1.      This personal injury lawsuit arises out of a trucking collision that occurred

on December 7, 2021, on I-40 Westbound near the 242 mile-marker in Forrest City,

Arkansas, causing serious and permanent injuries to Plaintiff. Jennifer Dysart, driving on

behalf of Blessed Road Inc. carrying a load authorized by CH Robinson Company, LLC,

CH Company, Inc., CH Robinson Worldwide, Inc., and Total Quality Logistics, LLC, in an

18-wheeler whose trailer was owned by Blessed Road Inc., failed to properly enter the

flow of traffic resulting in the Plaintiff being unable to avoid collision. Plaintiff brings these

claims pursuant to Arkansas state law seeking remedy for the injuries he suffered because of the collision.

2.      Defendants Blessed Road, Inc. and Jennifer N. Dysart subsequently removed this original civil matter to federal court, and it was consolidated with Case No. 2:24-cv-00076-BSM.

3.      Plaintiff now seeks to amend his complaint to add additional Defendants (CH Robinson Company, LLC; CH Robinson Company, Inc.; CH Robinson Worldwide, Inc.; and Total Quality Logistics, LLC) who may have fault for the serious and permanent injuries alleged in Plaintiff's Complaint.

## II. PARTIES

4.      Plaintiff Hutton incorporates by reference herein the preceding paragraph as though stated word-for-word.

### A. Plaintiff

5.      Plaintiff Charles Hutton is an adult, resident citizen of Mena, Arkansas, and has been a resident citizen of Arkansas at all material times referred to herein.

### B. Blessed Road Inc.

6.      Blessed Road Inc. is a for-profit foreign corporation organized under the laws of Missouri, with its principal place of business in Missouri.

7.      Blessed Road Inc. is authorized to do business in the State of Arkansas.

8.      Blessed Road Inc. is an over-the-road interstate motor carrier whose US DOT number is 003523113.

9.      At all times, Blessed Road Inc. had control over the 2014 Mack Trailer, license plate 15KS7G, registered in Missouri.

10.     Blessed Road Inc. may be served with process in this action by delivering summons and copy of this complaint to its registered agent for service, 1 Church Drive, Apartment 3, Kimberling City, MO, 65686.

11.     Blessed Road Inc., by and through its subsidiaries, derives substantial revenues from business in Arkansas.

### C. Jennifer Dysart

12.     At the time of the collision, Defendant Jennifer Dysart is an adult, resident citizen of Kimberling City, Stone County, Missouri.

13.     Upon information and belief, Defendant Jennifer Dysart has been a resident citizen of Missouri at all material times referred to herein.

14.     Defendant Dysart drove the tractor-trailer which was struck by the Plaintiff.

15.     Blessed Road Inc. employed Defendant Dysart.

### D. CH Robinson Company, LLC

16.     CH Robinson Company, LLC is a for-profit foreign limited liability company organized under the laws of Delaware, with its principal place of business in Minnesota.

17.     At all times, CH Robinson Company, LLC had control over the 2014 Mack Trailer, license plate 15KS7G, registered in Missouri.

18.     CH Robinson Company, LLC may be served with process in this action by delivering summons and copy of this complaint to its registered agent for service, Corporation Service Company, 2780 Snelling Avenue N., Suite 101, Roseville, MN 55113.

19.     CH Robinson Company, LLC, by and through its subsidiaries, derives substantial revenues from business in Arkansas.

20.    CH Robinson Company, LLC, is a subsidiary of CH Robinson Worldwide, Inc.

### E. CH Company, Inc.

21.    CH Company, Inc. is a for-profit foreign corporation organized under the laws of Delaware, with its principal place of business in Minnesota.

22.    At all times, CH Company, Inc. had control over the 2014 Mack Trailer, license plate 15KS7G, registered in Missouri.

23.    CH Company, Inc. may be served with process in this action by delivering summons and copy of this complaint to its registered agent for service, Corporation Service Company, 2780 Snelling Avenue N., Suite 101, Roseville, MN 55113.

24.    CH Company, Inc., by and through its subsidiaries, derives substantial revenues from business in Arkansas.

25.    CH Robinson Company, Inc., is a subsidiary of CH Robinson Worldwide, Inc.

### F. CH Robinson Worldwide, Inc.

26.    CH Robinson Worldwide, Inc. is a for-profit foreign corporation organized under the laws of Delaware, with its principal place of business in Minnesota.

27.    At all times, CH Robinson Worldwide, Inc. had control over the 2014 Mack Trailer, license plate 15KS7G, registered in Missouri.

28.    CH Robinson Worldwide, Inc. may be served with process in this action by delivering summons and copy of this complaint to its registered agent for service, Corporation Service Company, 2780 Snelling Avenue N., Suite 101, Roseville, MN 55113.

29.     CH Robinson Worldwide, Inc., by and through its subsidiaries, derives substantial revenues from business in Arkansas.

**G. Total Quality Logistics, LLC**

30.     Total Quality Logistics, LLC is a for-profit foreign limited liability company organized under the laws of Delaware, with its principal place of business in Ohio.

31.     Total Quality Logistics, LLC is authorized to do business in the State of Arkansas.

32.     At all times, Total Quality Logistics, LLC had control over the 2014 Mack Trailer, license plate 15KS7G, registered in Missouri.

33.     Total Quality Logistics, LLC may be served with process in this action by delivering summons and copy of this complaint to its registered agent for service, Corporate Creations Network, Inc., 609 SW 8TH ST, Suite 600, Bentonville, AR 72712.

34.     Total Quality Logistics, LLC, by and through its subsidiaries, derives substantial revenues from business in Arkansas.

35.     Defendant CH Robinson Company, LLC; CH Robinson Company, Inc.; and CH Robinson Worldwide, Inc. (hereafter collectively "CH Robinson") are a collection of interstate motor carrier that share and comingles resources with Blessed Road, Inc. and Total Quality Logistics, LLC to move goods across the interstates of Arkansas. "CH Robinson" is listed on the bill of lading and was contractually obligated to haul the subject load that was unsafely being transported in Arkansas at the time Plaintiff was seriously and permanently injured.

36.     At all times material hereto, each Defendant was acting as the agent and employee of each and every other defendant and was acting in the course and scope of

that agency and employment.

37.    Furthermore, the mergers, sales, and acquisitions of the various Defendants named above transferred both corporate assets and liabilities through to the successor corporations and/or partnerships. The above-named Defendants are liable for the acts and omissions, including but not limited to negligence and damages as pled below, of their subsidiaries, agents, employees, and/or servants of said Defendants and for their parent and principal. At all times relevant hereto, the above-named Defendants acted through their duly authorized subsidiaries, agents, employees, and/or servants who were acting within the scope of their employment and/or agency and in furtherance of the Defendants' business, whether through its principal or subsidiary.

38.    Finally, upon information and belief, the acts of the Defendants were conducted in concert pursuant to an agreement amongst themselves to act in a collective manner.   All defendants, therefore, are jointly and severally liable for the acts complained of herein.

### III. JURISDICTION AND VENUE

39.    Plaintiff Hutton incorporates by reference herein the preceding paragraphs as though stated word-for-word.

### A. Jurisdictional Facts regarding All Defendants

40.    This Court has jurisdiction over the subject matter of this controversy, pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of fees and interest.

41.    This Court has specific personal jurisdiction over the Defendants because the Defendants committed tortious acts in Arkansas, including, but not limited to, the personal injury that is the subject of this litigation.

42.    When assessing specific personal jurisdiction, the Court's first step "is to determine whether the connection between the forum and the episode-in-suit could justify the exercise of specific jurisdiction" because courts have the "ability to hear claims against out-of-state defendants when the episode-in-suit occurred in the forum or the defendant purposefully availed itself of the forum,"[1] and this case far exceeds that threshold.

43.    The affiliation between the Arkansas forum and the episode-in-suit warrants specific jurisdiction, which is properly exercised based on an "affiliation between the forum and the underlying controversy [such as] an occurrence that takes place in the forum"[2] (like the location of the fall in this controversy) so long as the fairness factors are met.[3]

44.    When assessing specific personal jurisdiction, the Court's second step "is to consider several additional factors to assess the reasonableness of entertaining the case."[4]

45.    When a corporation "purposefully avails itself of the privilege of conducting activities within the forum State … it has clear notice that it is subject to suit there [and if] the sale of a product of a manufacturer ... is not simply an isolated occurrence, but arises from the efforts of the manufacturer ... to serve *directly or indirectly,* the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if

---

1  *Daimler AG v. Bauman*, 134 S. Ct. 746, 755, 762 (2014).
2  *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773, 1780 (2017).
3  *Gibbs v. PrimeLending*, 2011 Ark. 255, 381 S.W.3d 829 (citing *International Shoe Co. v. Washington*, 326 U.S. 310 (1945)); *John Norrell Arms, Inc. v. Higgins*, 332 Ark. 24, 962 S.W.2d 801 (1998).
4  *Daimler AG*, 134 S. Ct. at 762.

its allegedly defective merchandise has there been the source of injury to its owner or to others,"[5] and this aptly describes Defendants' relationship with Arkansas.

46.    Where nonresident defendants "'purposefully derive benefit' from their interstate activities … it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities [because] the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed,"[6] and Defendants have purposefully obtained such benefits.

47.    A nonresident defendant is subject to personal jurisdiction under the Arkansas long-arm statute to the maximum extent permitted by the Due Process of Law Clause of the Fourteenth Amendment of the United States Constitution.[7]

48.    The Arkansas Supreme Court has considered three factors in determining whether due process requirements have been satisfied when personal jurisdiction has been exercised over nonresident defendants.   Those three factors[8] include:

    a. A defendant must purposefully avail himself of privilege of acting in forum statue or causing a consequence in forum state;

    b. Cause of action must arise from or relate to defendant's contacts with forum state; and

    c. Acts of defendant or consequences caused by defendant must have substantial enough connection with forum state to make exercise of personal jurisdiction over defendant reasonable.

49.    As outlined in this Complaint, all three factors have been satisfied for all nonresident Defendants in this action.

---

5 *See World–Wide Volkswagen v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).
6 *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473–74, 105 S. Ct. 2174, 2182–83 (1985).
7 A.C.A. § 16-4-101.
8 *Lawson v. Simmons Sporting Goods, Inc.*, 2019 Ark. 84; 569 S.W.3d 865 (2019).

50.     Furthermore, there is no burden on Defendants to litigate this civil action in the Arkansas forum where the crash occurred.

51.     Arkansas has an interest in adjudicating this dispute which occurred in Arkansas, which involved the assessment of conduct that occurred in Arkansas, and which significantly injured people using Arkansas roads.

52.     Plaintiff's interest in obtaining convenient and effective relief militates in favor of litigating in the Arkansas forum where the witnesses to the immediate post-crash investigation are located.

53.     The exercise of specific personal jurisdiction over Defendants pursuant to the Arkansas long-arm statute is consistent with the Due Process Clause and the principles of fundamental fairness by virtue of Defendants doing business in Arkansas.

54.     Defendants committed the torts at issue in this case where the causation of damages is an element of the tort and that element occurred in Arkansas.

55.     Defendants engage in such continuous, systematic behavior in Arkansas, and Defendants continually conduct business in Arkansas that each separate Defendant is "at home" in Arkansas.

56.     Defendants purposefully avail themselves of the privilege and opportunity to conduct business in Arkansas.

57.     Because Defendants purposefully derive benefit from its interstate activities, it would be unfair to allow Defendants to escape having to account in Arkansas for consequences that arise proximately from Defendants' interstate activities.

58.    Allowing the Defendants to escape jurisdiction would improperly allow Defendants to wield the Due Process Clause as a territorial shield to avoid interstate obligations that Defendants have voluntarily assumed.

**B. Venue**

59.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), as a substantial part of the events, acts and omissions giving rise to the claim occurred in counties in of this division.

**IV. FACTUAL ALLEGATIONS**

60.    Plaintiff Hutton incorporates by reference herein the preceding paragraphs as though stated word-for-word.

61.    On December 7, 2021, Mr. Hutton traveled westbound in the right lane on I-40 in Forrest City, Arkansas.

62.    Charles Hutton drove while his wife Bonnie Hutton rode as a passenger.

63.    Defendant Dysart also traveled in the same lane in front of Plaintiff.

64.    Defendant Dysart, driving as an employee on behalf of Blessed Road Inc., drove an 18-wheeler whose trailer was owned by Defendant Blessed Road Inc.

65.    Without checking for traffic in the lane she attempted to enter, Defendant Dysart moved her mechanically compromised motor carrier from the shoulder back on to the interstate driving approximately 5 miles per hour in front of Plaintiff.

66.    With no time to react from the shoulder movement, Mr. Hutton attempted to safely swerve his 18-wheeler into the left lane to avoid collision with Defendant Dysart.

67.    This evasive action resulted in Plaintiff clipping the right corner of Defendant Dysart's trailer.

68.    After the collision, Plaintiff Hutton's motor carrier flipped over at final rest, which caused a fire.

69.    The crash killed Plaintiff Hutton's wife who was riding as a passenger.

70.    The crash occurred on or about 8:43 am on December 7, 2021.

71.    Below are sequential representations of how the crash occurred:



72.    V2 represents Plaintiff Hutton, and V1 represents Defendants in the visuals in the above paragraph.

73.    At all times, Plaintiff Hutton operated his vehicle in a safe and prudent manner.

74.    CH Robinson Defendants[9] contractually obligated themselves to transport a load from Underwood, Iowa to Forrest City, Arkansas.

75.    At all times, CH Robinson was authorized to transport the subject load and had legally bound themselves to transport the subject load.

---

[9] When "CH Robinson Defendants" is used, it refers to CH Robinson Company, LLC, CH Company, Inc., and CH Robinson Worldwide, Inc.

76.    Instead of transporting the load with its own employees, CH Robinson comingled resources (such as drivers, trucks and trailers) with Blessed Road, Inc. and Total Quality Logistics so that the load could be moved from Underwood, Iowa to Forrest City, Arkansas.

77.    At all times, CH Robinson directed and controlled and/or had the right to control Blessed Road, Inc. and Dysart.

78.    While transporting the CH Robinson load, Dysart was a statutory employee and agent of CH Robinson under the Federal Motor Carrier Safety Regulations and was operating under the direction and/or control and/or right to control and in the course and scope of employment of CH Robinson and Total Quality Logistics.

79.    While Dysart was transporting the CH Robinson load, CH Robinson had the ability to stop the transportation at any time.

80.    The CH Robinson load that Dysart was transporting consisted of cargo that CH Robinson was authorized to transport, and that CH Robinson had accepted and legally bound themselves to transport.

81.    On all bills of lading pertaining to the subject load, CH Robinson was listed as the carrier responsible for transportation.

82.    CH Robinson accepted responsibility for ensuring delivery of the subject load being hauled by Dysart.

83.    As a result of the wreck, Plaintiff Hutton sustained significant and permanent injuries such as broken right wrist, torn bicep, rotator cuff injury, left knee among other injuries.

## V. CAUSES OF ACTION

### A. FIRST CAUSE OF ACTION – DIRECT AND VICARIOUS LIABILITY OF BLESSED ROAD INC.

84.    Plaintiff Hutton incorporates by reference herein the preceding paragraphs as though stated word-for-word.

85.    At the time of the crash, Defendant Blessed Road Inc. employed Defendant Dysart and provided policies and supervision to Defendant Dysart.

86.    Blessed Road Inc. hired Defendant Dysart and at all times of her employment retained control and authority over him, including the power to allow her to drive vehicles owned Blessed Road Inc. and make deliveries for Blessed Road Inc.

87.    At the time of the accident, Blessed Road Inc. paid Defendant Dysart, and Defendant Dysart's actions furthered the business interest of Blessed Road Inc.

88.    Defendant Dysart, and her employer Blessed Road Inc. had a direct, affirmative non-delegable duty, as a commercially licensed trucking operation, to operate their semi-tractor trailer safely and jointly on interstate highways in a reasonably prudent manner and with the highest degree of care.

89.    At all relevant times, Defendant Dysart was acting as an agent/employee/servant within the scope and course of her employment with Blessed Road Inc., subject to its direction and control while furthering their business interests and financial enterprises on interstate highways in the State of Arkansas.

90.    Blessed Road Inc. is affirmatively negligent, and directly and vicariously liable, under the doctrine of *respondent superior* and imputed conduct, for the conduct of its agent and employee within the course and scope of her employment.

91.    Defendant Dysart is an agent and employee of Blessed Road Inc. who

tasked Defendant Dysart to drive a tractor-trailer through the state of Arkansas on Interstate 40.

92.    Blessed Road Inc. entrusted, permitted, and allowed Defendant Dysart to operate Blessed Roads' commercial motor vehicle and to maneuver on a public highway in the negligent and reckless manner in which Defendant Dysart was driving at the time that Blessed Roads' commercial motor vehicle created the unsafe, dangerous condition and instrumentality on Interstate 40.

93.    The acts and omissions of Defendant Dysart are directly imputed to her employer and principal, Blessed Road Inc. Defendant Dyart's negligent and careless acts and omissions occurred while she was within the scope and course of her employment and in furtherance of the business interests of Blessed Road Inc. on the public roads and interstate highways in the State of Arkansas.

94.    Blessed Road Inc. is directly and affirmatively responsible for the actions of their employees, agents and servants in its trucking enterprise operating its vehicles on interstate highways.

95.    Blessed Road Inc failed to have standards, systems, policies and/or procedures in place to prevent its drivers from operating its truck, tractor, semitrailer, and commercial motor vehicle equipment and combination in a negligent, careless and/or reckless manner on interstate highways.

96.    Blessed Road Inc. through its direct corporate actions and inactions, adopted an unreasonable and imprudent policy, procedure practice and standard, in which they allowed and encouraged for financial benefits rather than discouraged, Defendant Dysart, to drive and operate the commercial motor vehicle, in the negligent,

careless and reckless manner in which Defendant Dysart was operating, maneuvering at the time of the collision on Interstate 40.

97.     Blessed Roads' agent, employee, and servant, in the course and scope of employment, as a commercially licensed driver, must be able to maintain, control and safely operate the semi-truck, trailer, semitrailer, on interstate highway systems, including public highways in the State of Arkansas.

98.     Under the FMCSR, the truck driver and motor carriers under U.S. DOT must have knowledge of the commercial motor vehicle, the equipment and use of the equipment. 49 C.F.R. §§ 383.11, 392.2, 392.7, 393.95, 395.2, 395.3. This knowledge includes pre-trip inspections, operations and emergency equipment inspection, operation, and use.

99.     This safe and prudent commercial motor vehicle operation under FMCSR, state law, and industry standards, customs, and practices, includes keeping a proper surveillance and lookout for other motor vehicles before braking, accelerating, changing speed and lane direction, crossing lanes of a highway, avoidance of willfully and wantonly operating a large semi-tractor trailer creating a dangerous instrumentality on public highway and endangering the safety of others on the roadway.

100.    Defendant Dysart must be properly trained to inspect her commercial motor vehicle, including emergency operation and use, proper sight and view of public traffic and safely prudent operations. Defendant Dysart must maintain a reasonable and prudent speed and lane control under the circumstances.

101.    Defendant Dysart must also not drive or operate a motor vehicle and motor carrier while distracted, not observant of other drivers on the highway and her vision and

ability to operate the motor vehicle are impaired as to make it unsafe for others traveling on the interstate.

102.    Blessed Road Inc. failed to train, supervise, monitor, and control its employees, including Defendant Dysart, regarding the rules, regulations, procedures and policies applicable to commercial drivers operating tractor-trailer trucks on the roads of the United States.

103.    Blessed Road Inc. failed to have policies and/or procedures in place to prevent its drivers, including Defendant Dysart, from operating Blessed Roads' semi-tractor-trailer and motor vehicle equipment in a negligent and/or reckless manner.

104.    Blessed Road Inc. failed to have appropriate industry standards, customs and practice and polies and/or procedures in place to prevent their semi-tractor drivers, including Defendant Dysart, from operating the semitrailer and tractor equipment in a negligent and/or reckless manner presenting appreciable risk of harm to public travelers on public highways in the State of Arkansas.

105.    Blessed Road Inc. was itself willful and wanton in its conduct, as it had notice or could have foreseen that Defendant Dysart would act willfully, wantonly, or with conscience indifference.

106.    It was foreseeable that the failure of Blessed Road Inc. to have a reasonably safe and prudent transportation system and to fail to control and operate their semi-trailer in a reasonably prudent and safe manner on an interstate highway in the State of Arkansas, would present and cause an appreciable risk of serious harm or danger to other public users and travelers on the interstate highway system.

107.    As a direct and proximate result of the collision and the wrongful and

negligent acts and/or omissions of Defendants, Plaintiff Hutton suffered, *inter alia,* severe and permanent injuries, past, present, and future lost wages and loss of earning capacity, conscious physical and emotional pain, suffering and mental anguish, past, present, and future medical costs, including care-taking expenses, and other damages in excess of the amount required for federal diversity jurisdiction.

**B. SECOND CAUSE OF ACTION – DIRECT NEGLIGENCE OF JENNIFER DYSART**

108.    Plaintiff Hutton incorporates by reference herein the preceding paragraphs as though stated word-for-word.

109.    Defendant Dysart owed a duty to keep a proper lookout before entering the interstate for the safety of Plaintiff and others, both before and at the time of the collision.

110.    At the time of the collision, Defendant Dysart violated this duty of keeping a proper look out before entering the interstate, which needlessly caused serious and permanent personal injury and property damage to Plaintiff Hutton.

111.    Defendant Dysart proceeded to re-enter traffic from the shoulder of the road at a dangerously low speed without keeping a proper lookout for other drivers.

112.    The speed at which Defendant Dysart re-entered the road did not allow other drivers, such as the Plaintiff Hutton, to have adequate time to prevent collision.

113.    Defendant Dysart owed a duty to keep the commercial vehicle under proper control for the safety of Plaintiff Hutton and others, both before and at the time of the collision.

114.    At the time of the collision, Defendant Dysart violated this duty of keeping the commercial vehicle under proper control, which needlessly caused serious and permanent personal injury and property damage to Plaintiff Hutton.

115.    Defendant Dysart owed a duty to drive the commercial vehicle in such a manner as to not indicate a wanton disregard for the safety of the Plaintiff Hutton and others, both before and at the time of the collision.

116.    At the time of the collision, Defendant Dysart violated this duty of driving the commercial vehicle in such a manner as to not indicate a wanton disregard, which needlessly caused serious and permanent personal injury and property damage to the Plaintiff Hutton.

117.    Defendant Dysart owed a duty to use ordinary care for the safety of the Plaintiff Hutton and others, both before and at the time of the collision.

118.    At the time of the collision, Defendant Dysart violated this duty of using ordinary care, which needlessly caused serious and permanent personal injury and property damage to the Plaintiff Hutton.

119.    Defendant Dysart owed a duty to stay alert and to drive attentively for the safety of the Plaintiff Hutton and others, both before and at the time of the collision.

120.    At the time of the collision, Defendant Dysart violated this duty of staying alert and driving attentively, which needlessly caused serious and permanent personal injury and property damage to the Plaintiff Hutton.

121.    Defendant Dysart owed a duty to comply with Federal and State law, accepted traffic safety engineering principles, and local laws governing safety and health including, but not limited to Federal Highway Administration Regulations, MUTCD, OSHA, and Arkansas State Highway and Transportation Department Standards for the safety of the Plaintiff Hutton and others, both before and at the time of the collision.

122.    At the time of the collision, Defendant Dysart violated this duty of complying

with comply with Federal and State law, accepted traffic safety engineering principles, and local laws governing safety and health including, but not limited to Federal Highway Administration Regulations, MUTCD, OSHA, and Arkansas State Highway and Transportation Department Standards, which needlessly caused serious and permanent personal injury and property damage to the Plaintiff Hutton.

123.   The above-referenced Arkansas statutes and the Federal Motor Carrier Safety Regulations were enacted and intended to protect motorists, passengers, and pedestrians from the dangerous operation of vehicles, including semi-tractor trailers operating upon public roadways and interstate highways. At the time of the statutory violations alleged above, Plaintiff Hutton was a motorist on an interstate highway, and thus belonged to the class of persons that these Arkansas statutes and the Federal Motor Carrier Safety Regulations were enacted and intended to protect.

124.   It was foreseeable that the failure of Defendants to have a reasonably safe and prudent transportation system and to fail to control and operate their semi-trailer in a reasonably prudent and safe manner on an interstate highway in the State of Arkansas, would present and cause an appreciable risk of serious harm or danger to other public users and travelers on the interstate highway system.

125.   As a direct and proximate result of the collision and the wrongful and negligent acts and/or omissions of Defendants, the Plaintiff Hutton suffered, *inter alia,* severe and permanent injuries, past, present, and future lost wages and loss of earning capacity, conscious physical and emotional pain, suffering and mental anguish, past, present, and future medical costs, including care-taking expenses, and other damages in excess of the amount required for federal diversity jurisdiction.

## C. THIRD CAUSE OF ACTION – OPERATING UNSAFE VEHICLE

126.   Plaintiff Hutton incorporates by reference herein the preceding paragraphs as though stated word-for-word.

127.   Defendant Dysart knew her 18-wheeler was undergoing mechanical issues prior to the collision.

128.   Defendant Dysart proceeded to operate her 18-wheeler while knowing the vehicle was undergoing mechanical issues.

129.   Defendant Dysart should have known that the operation of an unsafe vehicle could result in direct or indirect harm to the livelihood or property of other drivers on the road.

130.   Through her operation of an unsafe vehicle, Defendant Dysart caused a collision with the Plaintiff Hutton that could have been avoided had the Defendant not operated an unsafe vehicle.

131.   As a direct and proximate result of the collision and the wrongful and negligent acts and/or omissions of Defendants, the Plaintiff Hutton suffered, *inter alia,* severe and permanent injuries, past, present, and future lost wages and loss of earning capacity, conscious physical and emotional pain, suffering and mental anguish, past, present, and future medical costs, including care-taking expenses, and other damages in excess of the amount required for federal diversity jurisdiction.

## D. FOURTH CAUSE OF ACTION – DIRECT LIABILITY OF CH ROBINSON DEFENDANTS

132.   Plaintiff Hutton incorporates by reference herein the preceding paragraphs as though stated word-for-word.

133.    CH Robinson shared equipment and comingled resources as part of a joint venture with Blessed Road to transport and deliver the subject load.

134.    At the time of the accident, Separate Defendant Dysart was furthering the business interests of Blessed Road and CH Robinson.

135.    CH Robinson is jointly and severally responsible for Separate Defendants Dysart and Blessed Road under the theories of *respondeat superior*, agency, master and servant, borrowed servant, joint venture, piercing the corporate veil and alter ego.

136.    CH Robinson independently and as part of a joint venture has duties of care, safety and responsibilities owed to the traveling public on interstate highway under Federal Motor Carrier Safety Regulations ("FMCSRs"), state laws, and industry standards, practices and customs.

137.    CH Robinson is required by the Federal Motor Carrier Safety Administration to know and comply with FMCSRs and pursuant to 49 C.F.R. § 392.2, the state laws for motor carriers and the operating of commercial motor vehicles in the jurisdiction where they operate.

138.    Under the FMCSR and industry safe practices and standards, CH Robinson is required to have in place a safety management control system that contains practices and policies to ensure safety on the roadway under 49 C.F.R. § 385.3. This safety management system includes policies, program, practices and procedures, which include, but are not limited to, proper, reasonable and prudent driver advertising, inquiry, selection, hiring, orientation, supervising, monitoring, training and entrustment with commercial motor vehicles, safe route selection, safe commercial motor vehicle parking and operations, safety and transportation documentation, due diligence, electronic log

oversight, audits, training, supervision, monitoring, document preservation and overall oversight and safety review in order to ensure safe operations and compliance with applicable FMCSR safety regulations and laws in Arkansas.

139.    The overall trucking fleet and enterprise safety system is a direct obligation, duty and responsibility of Defendants.   This direct obligation, duty and responsibility arises from the FMCSRs, state laws, industry standards and the direct representations and certifications by Separate Defendants Blessed Road , Total Quality Logistics, and CH Robinson to the US DOT and Federal Motor Carrier Safety Administration that as interstate motor carriers, they were familiar with and would comply with the FMCSRs and have in place safety policies and procedures in order to obtain federal US DOT operating authority for transportation of cargo on public highways with commercial motor vehicles.

140.    CH Robinson knew or should have known that the transportation trip it required Dysart to undertake could not be completed safely nor without endangering the traveling public.

141.    Under federal law, CH Robinson is required to comply with federal and state laws and have in place a safety management control system for their joint trucking enterprise and trucking fleet to prevent accidents and collisions on the part of its trucking operations on interstate highways as part of their public franchise, interstate operations and trucking fleet.

142.    CH Robinson had a duty to ensure that cargo and loads it was authorized and legally obligated to transport could be done in a reasonable safe manner without endangering the traveling public.

143.    As an interstate trucking enterprise and joint venture, CH Robinson had a direct, affirmative non-delegable duty, as a commercially licensed trucking operation, to safely and jointly operate its tractor and semitrailer, on interstate highways in a reasonably prudent manner and with the highest degree of care to avoid risk and prevent property damage and injury to other public travelers.

144.    These non-delegable duties required CH Robinson at all relevant times, to act reasonably and prudently and orient, train and supervise their tractor and semitrailer operators and have in place proper policies, procedures, systems and protocols for the hiring, orientation, training, entrustment, permitted use, supervision, direction and control of their truck drivers, equipment and loads it is originally authorized and legally obligated to transport while on interstate highways operating tractors and semitrailers on highways in the State of Arkansas.

145.    CH Robinson was required by industry standards, custom, usages, protocols and practice and the FMCSRs to have in place adequate documentation, training, policies and procedures, to support recruiting, soliciting and contracting with experienced and qualified truck drivers to transport cargo on interstate and public highways.

146.    CH Robinson was required by industry standards, customs and practice and FMCSR to have in place proper documentation and support for its driver hiring, orientation, training, hours supervision, company training under the FMCSRs, including an audit system for reviewing electronic driver's daily logs, electronic training modules and real-time safety issues for its transportation system.

147.    CH Robinson was required by industry standards, customs and practice and the FMCSRs to maintain proper internal, supporting documentation for its transportation and trucking policies, procedures, systems, driver qualifications, driving training, trucking equipment safety, and safety files.

148.    CH Robinson had a direct, affirmative non-delegable duty to reasonably inquire, select, orient, train, supervise and monitor its drivers and equipment used to transport its loads to comply with all FMCSRs and state laws in the jurisdictions where Defendants operated commercial motor vehicles and sent commercial motor vehicles on commercial rights for their joint financial benefit.    This duty to inquire, select, orient, train, supervise and monitor required that Defendants not place unsafe, not reasonably prudent and incompetent commercial motor vehicle operators on the road who operated Defendants' equipment in an unsafe and not reasonably prudent manner on public roadways while transporting CH Robinson's cargo.

149.    CH Robinson negligently hired, supervised, trained, monitored, retained and entrusted Estes's cargo and equipment to its unqualified and unsafe driving team, including Blessed Road and Dysart, and knew, or in the exercise of reasonable care should have known, that its unqualified and unsafe employees subjected others on public highways to an unreasonable risk of harm.

150.    CH Robinson negligently supervised, monitored, and entrusted its load to Separate Defendants Blessed Road and/or Dysart, and knew, or in the exercise of reasonable care should have known, that its load could not be transported by Blessed Road, and/or Dysart without subjecting others on public highways to an unreasonable risk of harm.

151.   CH Robinson had separate, independent duties of care, safety and responsibilities owed to the traveling public on interstate highways under the FMCSRs, state laws and industry standards, practices and customs.

152.   CH Robinson had a direct, affirmative non-delegable duty, as a commercially licensed trucking operation and DOT motor carrier, to safely and jointly operate the truck tractor and semitrailer on interstate highways, in a reasonably prudent manner and with the highest degree of commercial driver's license care and DOT operating authority to prevent injury to public travelers on the interstate highway system.

153.   CH Robinson publicly represented and certified to the Federal Motor Carrier Safety Administration that it had a safety system in place, proper documentation in driver hiring, orientation, safety and training modules, proper driver files and proper safety reviews and audits of electronic logs and would use these resources to transport all loads that it was originally authorized and legally obligated to transport.

154.   CH Robinson violated the applicable FMCSRs and state laws in its unsafe corporate conduct and commercial motor vehicle operations on public highways.   The FMCSRs, Arkansas state safety regulations, and Arkansas Rules of the Road were in place at the time of the collision to ensure safe operations, avoid dangerous instrumentalities on the roadway and prevent collisions by affirmative acts, conducts and safety systems in place.

155.   CH Robinson violated the above duties by allowing its load to be delivered under circumstances including time and distance requirements and using equipment it knew or should have known were unsafe and subjected the travel public to an unreasonable risk of harm.

156.   CH Robinson directly violated industry customs, standards, custom and usage and was not prudent in permitting its truck drivers and loads to be unsafe, incompetent, untrained and to operate carelessly, negligently, unsafely and illegally on public highways across the United States and the State of Arkansas.

157.   CH Robinson's joint transportation system with Blessed Road and Total Quality Logistics expanded CH Robinson's fleet and interstate transportation operations creating hazardous and dangerous conditions and circumstances for the traveling public.

158.   CH Robinson made a business decision to create joint and common business practices for the transportation of goods using the roadways in the State of Arkansas, so that it comingled resources with Blessed Road and Total Quality Logistics, allowing Defendants to  jointly participate and profit by acting as one transportation company including but not limited to negligently inquiring, acquiring, retaining, hiring and using drivers and using unsafe equipment when they knew that due to their joint business decisions they did not have adequate resources to safely operate said common business practice.

159.   CH Robinson's transportation system improperly advanced driver short-cuts, bypassed industry wide safety practices, interfered and impeded with policies and procedures for promoting safe driving practices on the roadways, and resulted in the lack of use or negligent use of necessary safety equipment and supplies for its drivers to safely travel and maneuver on the roadways in Arkansas.

160.   CH Robinson's corporate course of conduct and pattern of practice and fleet expansion resulted in unsafe practices, increasing risk and danger to public travelers,

deviated from industry standard safety norms, safety and rules of the road, and reasonable and prudent transportation industry and motor carrier practices.

161.  CH Robinson's joint trucking operation practices and transportation system with Blessed Road and Total Quality Logistics created an unnecessary, unsafe, and appreciable risk of danger to the road users of Arkansas.

162.  CH Robinson, through its joint and common business practices with Blessed Road and Total Quality Logistics, is directly and independently negligent for acquiring, retaining, hiring, contracting, and entrusting its equipment to an unsafe truck driver and unsafe tractor truck.

163.  CH Robinson violated numerous laws in Arkansas, rules of the road, industry standards, safe driving and operating practices, customs and FMCSRs by operating unsafe equipment on the interstates of Arkansas.

164.  CH Robinson failed to have a safe and reasonably prudent transportation system in place, and the numerous safety failures resulted in an unsafe, dangerous and hazardous condition on Interstate 40 causing the serious and permanent injuries to Charles Hutton.

165.  CH Robinson should not have permitted unsafe, incompetent truck drivers and equipment to operate and use their truck tractor semitrailer commercial motor vehicle unit on Interstate 40 in the State of Arkansas.

166.  CH Robinson should not have permitted its load to be transported in the unsafe Blessed Road semitrailer to travel on the roads of Arkansas when it knew or should have known that the trip could not have been completed safely.

167.   CH Robinson was also negligent for failing to separately train, educate, supervise and monitor its unsafe and incompetent drivers it contracted with, employed, hired and retained and failed to have proper supervision and qualification standards, which were not prudent and reasonable, and placed the public in harms' way.

168.   CH Robinson's direct and repeated violations of the FMCSRs, safety laws, violation of known safety principles for operation of commercial motor vehicles, parking and routes, was the result of a lack of safety management controls, policies, practices and procedures to ensure compliance with applicable safety regulations to ensure the safe movement of cargo through the transportation system and to reduce the risk of serious injury and death from highway collisions and hazardous materials spilling from diesel tanks facing public travelers, resulting in extremely unsafe, hazardous and dangerous conditions for the public.   49 C.F.R. §§ 383, 385.3, 390.5, 371.1, 49 U.S.C. §§ 13101(a)(1)(B), (a)(2)(I), 49 U.S.C. §§ 14101 and 14704.

169.   CH Robinson failed to train, supervise, monitor and control their contracted load and agents, including Separate Defendant Dysart, regarding the industry standards, customs, conduct, rules, regulations, procedures and policies applicable to commercial drivers operating truck tractor semitrailer commercial motor vehicle units on the roads of the United States.

170.   CH Robinson failed to supervise its subject load that it was originally authorized and legally obligated to transport.

171.   CH Robinson failed to have standards, systems, policies and/or procedures in place to prevent its loads from being delivered or hauled in a negligent, careless, and/or reckless manner on interstate highways by its subhaulers and/or subcontractors.

172.    Under the FMCSRs, the truck drivers and motor carriers, such as CH Robinson, must have knowledge of the commercial motor vehicle, the equipment and use of the equipment.    49 C.F.R. §§ 383.11, 392.2, 392.7, 393.95, 395.2, 395.3.    This knowledge includes pre-trip inspections, operations, and hours needed for drivers, such as Dysart to complete an assigned trip.

173.    CH Robinson through its direct corporate actions and inactions, adopted an unreasonable and imprudent policy, procedure practice and standard, in which it allowed and encouraged for financial benefit, rather than discouraged, Separate Defendants Dysart, to drive and transport CH Robinson's load in the fatigued, negligent, careless and reckless manner with unsafe equipment in which Separate Defendant Dysart was operating at the time of the collision.

174.    CH Robinson, through its corporate actions and inactions, adopted a policy and negligent interstate fleet and transportation system, in which it allowed and encouraged, rather than discouraged safety and compliance with the FMCSRs and state laws, and under this negligent policy and system including but not limited to instructing drivers to deliver loads when it knew or should have known the equipment being used was unsafe for travel.

175.    CH Robinson could have acted to prevent the collision alleged in this lawsuit, but was directly, separately, and affirmatively negligent as a corporation from Separate Defendants Dysart, and this separate negligence caused damages to Charles Hutton. CH Robinson is directly, separately, and affirmatively liable for its own separate negligent, unreasonable and imprudent corporate conduct, acts and omissions, which would have separately prevented the collision and harm to Charles Hutton.

176. It was foreseeable that the failure of CH Robinson to have a reasonably safe and prudent transportation system and to fail to control and transport its contracted load in a reasonably prudent and safe manner on an interstate highway in the State of Arkansas, would present and cause an appreciable risk of serious harm or danger to other public users and travelers on the interstate highway system.

177. As a direct and proximate result of the collision and the wrongful and negligent acts and/or omissions of Defendants, the Plaintiff Hutton suffered, *inter alia,* severe and permanent injuries, past, present, and future lost wages and loss of earning capacity, conscious physical and emotional pain, suffering and mental anguish, past, present, and future medical costs, including care-taking expenses, and other damages in excess of the amount required for federal diversity jurisdiction.

## E. FIFTH CAUSE OF ACTION – VICARIOUS LIABILITY OF CH ROBINSON DEFENDANTS

178. Plaintiff Hutton incorporates by reference herein the preceding paragraphs as though stated word-for-word.

179. CH Robinson was providing transportation using a tractor not owned by it under an arrangement with Blessed Road and Total Quality Logistics.

180. CH Robinson had a legal right and duty to control its leased semitrailer under the FMCSRs.

181. CH Robinson had complete control over and profited from the use of its leased semitrailer and was in a better position than Charles Hutton and the traveling public to prevent unsafe practices from the transportation of its load.

182. At all relevant times, Separate Defendant Dysart was acting as agents, employees, and/or servants within the scope and course of her employment with Blessed

Road, subject to the Defendants' joint venture, and CH Robinson's and Total Quality Logistics' direction and control and right of control, while furthering Defendants' business interests and financial enterprise on public highways in the State of Arkansas.

183.   CH Robinson, at all relevant times, retained control and authority over Dysart and the subject load, including the power to allow them to transport the subject load and use CH Robinson semitrailers.

184.   CH Robinson, at all relevant times, retained control and authority over Dysart and the subject load, in that CH Robinson could stop the transportation of the subject load at any time and at any place.

185.   CH Robinson is affirmatively negligent and directly and vicariously liable, under the doctrine of *respondeat superior* and imputed conduct, for the conduct of their agents, servants and employees within the course and scope of their employment.

186.   The acts and omissions of Separate Defendant Dysart are directly imputed to CH Robinson because Separate Defendant Dysart acting and operating the semitrailer and transporting the load that CH Robinson was contractually obligated itself to transport as the "carrier." This transportation created the dangerous, unsafe condition on Interstate 40 and in furtherance of the business interests of CH Robinson.

187.   As a direct and proximate result of the collision and the wrongful and negligent acts and/or omissions of Defendants, the Plaintiff Hutton suffered, *inter alia,* severe and permanent injuries, past, present, and future lost wages and loss of earning capacity, conscious physical and emotional pain, suffering and mental anguish, past, present, and future medical costs, including care-taking expenses, and other damages in excess of the amount required for federal diversity jurisdiction.

## F. SIXTH CAUSE OF ACTION – DIRECT AND VICARIOUS LIABILITY OF TOTAL QUALITY LOGISTICS, LLC

188.    Plaintiff Hutton incorporates by reference herein the preceding paragraphs as though stated word-for-word.

189.    Total Quality Logistics publicly represented and certified to the Federal Motor Carrier Safety Administration that it had a safety system in place, proper documentation in driver hiring, orientation, safety and training modules, proper driver files and proper safety reviews and audits of electronic logs and would use these resources to transport all loads.

190.    Total Quality Logistics knew or should have known that the subject load could not be safely transported safely under the required time restraints and using the equipment it, CH Robinson and Blessed Road imposed on their driver Dysart.

191.    Total Quality Logistics is required by the Federal Motor Carrier Safety Administration to know and comply with the FMCSRs and, pursuant to 49 C.F.R. § 392.2, the state laws for motor carriers and the operating of commercial motor vehicles in the jurisdiction where they operate.

192.    Total Quality Logistics knew or should have known that the transportation trip it required Dysart to undertake could not be completed safely nor without endangering the traveling public

193.    Total Quality Logistics had a duty to ensure that cargo and loads it participated in transporting would be able to be completed and transported in a reasonably safe manner without requiring drivers to not be out of service and using safe equipment on the interstates of Arkansas.

194.    Total Quality Logistics was required by industry standards, customs and practice and the FMCSRs to have in place proper documentation and support for its driver hiring, orientation, training, hours supervision, company training under the FMCSRs, including an audit system for reviewing the equipment used in transporting loads, driver's electronic daily logs, electronic training modules and real-time safety issues for its transportation system.

195.    Total Quality Logistics negligently hired, supervised, trained, monitored, retained and entrusted their unqualified and unsafe driving team, including Separate Defendant Dysart, and knew, or in the exercise of reasonable care should have known, that its unqualified and unsafe equipment used by Dysart subjected others on public highways to an unreasonable risk of harm.

196.    Total Quality Logistics negligently supervised, monitored, and entrusted the subject load during transportation when it knew, or in the exercise of reasonable care should have known, that it could not be transported by Blessed Road and Dysart without subjecting others on public highways to an unreasonable risk of harm.

197.    Total Quality Logistics violated the above duties by allowing the subject load to be delivered under circumstances including time and distance requirements using unsafe equipment it knew or should have known were unsafe and subjected the travel public to an unreasonable risk of harm.

198.    Total Quality Logistics failed to have standards, systems, policies and/or procedures in place to prevent loads from being delivered or hauled in a negligent, careless, and/or reckless manner on interstate highways by its subhaulers and/or subcontractors.

199.    Total Quality Logistics, through its corporate actions and inactions, adopted a policy and negligent interstate fleet and transportation system, in which it allowed and encouraged, rather than discouraged safety and compliance with the FMCSRs and state laws, including but not limited to instructing drivers to deliver loads when it knew or should have known they would be using unsafe equipment.

200.    As a direct and proximate result of the collision and the wrongful and negligent acts and/or omissions of Defendants, the Plaintiff Hutton suffered, *inter alia*, severe and permanent injuries, past, present, and future lost wages and loss of earning capacity, conscious physical and emotional pain, suffering and mental anguish, past, present, and future medical costs, including care-taking expenses, and other damages in excess of the amount required for federal diversity jurisdiction.

### F. SEVENTH CAUSE OF ACTION – GROSS NEGLIGENCE

201.    Plaintiff Hutton incorporates by reference herein the preceding paragraphs as though stated word-for-word

202.    The wrong done by the Defendants was aggravated by the kind of gross negligence, malice, and callous disregard for which the law allows the imposition of exemplary and punitive damages.

203.    The conduct of the Defendants, when viewed objectively from the Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and the Defendants were in fact subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare to others.

204.    The Defendants' acts of omission and commission, which collectively and

severally constituted gross negligence, were a proximate cause of Plaintiff Hutton's injuries and damages.

## VI. CAUSATION OF PLAINTIFF'S INJURIES AND DAMAGES

205.   Plaintiff Hutton incorporates by reference herein the preceding paragraphs as though stated word-for-word.

206.   The injuries and damages sustained by Plaintiff Hutton, more particularly described below, were produced in a natural and continuous sequence from Defendants' violations of one or more of the above-described independent duties to use ordinary care for the safety of the Plaintiff Hutton.

207.   The injuries and damages sustained by the Plaintiff Hutton were a probable consequence from the Defendants' violations of one or more of the above-described independent duties to use ordinary care for the safety of the Plaintiff Hutton.

208.   Defendants should have foreseen and anticipated that a violation of one or more of the above-described independent duties to use ordinary care and follow the safety rules would constitute an appreciable risk of harm to others, including Plaintiff Hutton.

209.   If Defendants had not violated one or more of the above-described independent duties to use ordinary care and to follow the safety rules for the safety of the Plaintiff Hutton, then Plaintiff Hutton's injuries and damages would not have occurred.

## VII. COMPENSATORY DAMAGES SUSTAINED BY PLAINTIFF HUTTON

210.   Plaintiff Hutton incorporates by reference herein the preceding paragraphs as though stated word-for-word.

211.   The injuries and damages sustained by Plaintiff Hutton because of

Defendants' violations of one or more of the above duties, include, but are not limited to, the following:

i.   Serious and permanent bodily injuries to Plaintiff Hutton's body, which are life-changing events causing the Plaintiff Hutton to lose the ability to enjoy a normal quality of life;

ii.  Medical expenses incurred in the past and reasonably expected to be incurred in the future, and transportation expenses to obtain such medical treatment;

iii. Physical pain and suffering experienced in the past and reasonably expected to be experienced in the future;

iv.  Loss of income in the past and reasonably expected to be experienced in the future;

v.   Loss of earning capacity due to permanent physical impairment from the injuries caused by the collision;

vi.  Mental anguish experienced in the past and reasonably expected to be experienced in the future, which includes, but is not limited to, Plaintiff Hutton's loss of quality of life due to permanent injuries causing chronic pain that limit their activities; and

vii. The reasonable expense of any necessary help in Plaintiff Hutton's home in the past, and reasonably certain to be required in the future, because of Plaintiff Hutton's injuries.

## VIII. AMOUNT OF DAMAGES

212.   Plaintiff Hutton incorporates by reference herein the preceding paragraphs as though stated word-for-word.

213.   Plaintiff Hutton's injuries and damages are in excess of the minimum amount required for federal court jurisdiction in diversity of citizenship cases, for which Plaintiff Hutton should be awarded a judgment as against Defendants in an amount to

fully and fairly compensate him for each and every element of damages that has been suffered.

### IX. PUNITIVE DAMAGES

214.    Plaintiff Hutton incorporates by reference herein the preceding paragraphs as though stated word-for-word.

215.    Plaintiff Hutton is entitled to recover punitive damages in accordance with Arkansas law, based upon the Defendants' complete indifference to and conscious disregard for the safety of Plaintiff Hutton and others, causing or contributing to catastrophic and permanent injuries. The Defendants' wanton and reckless acts and omissions occurred under circumstances where their conduct, in total disregard of the consequences, would naturally and probably result in injury or damages to Plaintiff Hutton. The Defendants knew or should have known, in light of the surrounding circumstances, that their conduct would naturally and probably result in catastrophic and serious injury, and they continued this conduct with malice and wanton and reckless disregard for the consequences of its actions for which punitive damages should be awarded.

216.    In addition to actual, special, consequential, and compensatory damages, Plaintiff Hutton demands a judgment against Defendants for punitive damages in an amount necessary and sufficient to deter Defendants from the above-described conduct and to punish Defendants for their willful, wanton, gross, flagrant, reckless, outrageous, and egregious conduct.

217.    Specifically, Blessed Road Inc. was itself willful and wanton in its conduct, including its failure to train, supervise and control Defendant Dysart and its tractor trailer,

as Blessed Road Inc. had notice or could have foreseen that Defendant Dysart would act willfully, wantonly, or with conscience indifference.

## X. DEMAND FOR JURY TRIAL

218.   Plaintiff Hutton incorporates by reference herein the preceding paragraphs as though stated word-for-word.

219.   Plaintiff Hutton demands a jury trial for all issues of fact presented by this action.

## XI. RESERVATION OF ADDITIONAL CLAIMS

220.   Plaintiff Hutton incorporates by reference herein the preceding paragraphs as though stated word-for-word.

221.   Plaintiff Hutton reserves the right to plead further upon completion of discovery to state additional claims and to name additional parties to this action.

WHEREFORE, Plaintiff Hutton prays that after a jury trial of this action that he be awarded the following:

A.   A judgment against Defendants in such an amount that will fully and fairly compensate Plaintiff Hutton for all of the above-described damages and in an amount in excess of that required for federal court jurisdiction in diversity of citizenship cases;

B.   A judgment and verdict against Defendants awarding exemplar or punitive damages as permitted by law;

C.   All costs expended herein including attorneys' fees and any expert costs and fees as permitted by law;

D.   A pre- and post-judgment interest award against Defendants to compensate for loss of money and to the extent of and for the reasons permitted by law; and

E.   All other proper relief to which Plaintiff Hutton may be entitled in the premises.

Respectfully Submitted,

Joseph Gates, Bar No. 2010239
**Gates Law Firm, PLLC**
2725 Cantrell Road, Suite 105
Little Rock, AR 72202
Phone: (501) 779-8091
Fax: (479) 269-9788
Email: Gates@GatesLawPLLC.com

By:     Joseph Gates

## CERTIFICATE OF SERVICE

I hereby certify that on the _____ day of December, 2024, I conventionally filed the foregoing with the Clerk of Court, which shall send notification of such filing through the CM/ECF system to the following:

Jerry J. Sallings, Ark. Bar No. 84134
**Wright, Lindsey, & Jennings LLP**
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-8699

*Attorneys for Defendants*

Joseph Gates